**United States District Court**
For the Northern District of California

1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    SPPI-SOMERSVILLE, INC., *et al.*,              No. C 04-2648 SI
                                                    Consolidated with 07-5824 SI
9              Plaintiffs,
                                                    **ORDER RE: SUMMARY JUDGMENT**
10     v.                                           **MOTIONS**

11   TRC COMPANIES, INC., *et al.*,

12             Defendants.
     ———————————————————————/
13
     AND RELATED CROSS- AND COUNTER-
14   CLAIMS
     ———————————————————————/
15

16          On August 21, 2009, the Court held a hearing on various motions for summary judgment.  This

17   order resolves all of the pending motions.

18

19                                    **BACKGROUND**

20          This case is about four parcels of real property, totaling approximately 24 acres, located on both

21   sides of Markley Creek in Antioch, California.  The parcels are Assessor Parcel Numbers 076-010-030,

22   031, and 032, located north of Markley Creek and owned by plaintiff SPPI-Somersville, Inc. ("SPPI"),

23   and Assessor Parcel Number 076-010-034, located south of Markley Creek and owned by plaintiff

24   Somersville-Gentry, Inc. ("SGI")[1]  Both SPPI and SGI are owned and/or controlled by the same

25   principal, Albert Seeno, Jr.

26          Plaintiffs' property ("the Property") is adjacent or near to the Contra Costa Sanitary Landfill (the

27   ————————————————

28          [1] The parties refer to the properties individually by their parcel numbers (e.g, "Parcel 34"), and
     collectively as the "Subject Property."

"CCSL Landfill") and the Old Antioch Landfill.  Plaintiffs claim that the CCSL Landfill is the source of groundwater contamination on and under the Property, and that the CCSL Landfill and the Old Antioch Landfill are the source of surface contamination on the Property.

Plaintiffs purchased the Property on November 21, 2003 from the Tom Gentry California Company ("TGCC").  TGCC in turn, had purchased the Property in 1996 from Standard Oil Company of California, predecessor in interest to defendant Chevron.  Standard Oil leased Parcel 34 to defendant Antioch in December 1957 for the disposal of waste by the sanitary landfill method.  Plaintiffs allege Standard Oil failed to disclose the presence of the landfill on Parcel 34, which Antioch operated for one year with the consent of Standard Oil under the lease.

Plaintiffs allege that the groundwater and surface contamination on the Property has caused them to incur significant investigative and remediation expenses, and is preventing and delaying the development of the Property.[2]  Plaintiffs have sued the current and former owner-operators of the CCSL Landfill and the Old Antioch Landfill, and various defendants who disposed of waste at the landfills.[3]  Plaintiffs' master complaint[4] alleges the following claims: (1) recovery of response costs under Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"); (2) contribution under CERCLA; (3) injunctive relief under the Resource Conservation and Recovery Act ("RCRA"); (4) declaratory relief under federal law; (5) private continuing nuisance; (6) continuing trespass; (7) negligence; (8) negligence per se; (9) ultrahazardous activity; (10) non-disclosure; and (11) declaratory relief under state law.

---

[2]  It is undisputed that as a result of various remediation measures, the only remaining surface contamination at issue relates to the "wedge" of waste along the southern bank of Markley Creek.  The "wedge" is discussed *infra*.

[3]  The defendants' relationships to the landfills are discussed in the context of the various motions.  The Generator defendants include 35 private entities and the Federal defendants are the United States Department of the Army, United States Department of Defense, and the United States Department of the Navy.  Plaintiffs have sued Mary Grace Prewett Bertsch and Harold Prewett, who inherited fractional interests in the landfills.  The Prewetts are represented by the same counsel as TRC, GBF and the Generator defendants, and are often but not always included with the Generator defendants.

The "CCWS" defendants refer collectively to Contra Costa Waste Service, Inc., City of Pittsburg, Pittsburg Disposal & Debris Box Service, Inc., Estate of Silvio Garaventa, The Garaventa Family Trust, Mary Garaventa (individually and as the administratrix of the Estate of Silvio Garaventa, Sr., and Trustee of the Garaventa Family Trust), and Silvio Garaventa Jr.

[4]  Plaintiffs filed a related case, 07-5824, which was consolidated with the 2004 action.

**United States District Court**
For the Northern District of California

The parties have filed a number of motions addressing the CERCLA Section 107 response cost claims, the RCRA claims, the federal and state declaratory relief claims, and the state tort claims.

## LEGAL STANDARD

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

I.    **Plaintiffs' motion against Chevron and Antioch (381); Chevron's motion for summary judgment (394)[5] regarding surface contamination**

A.    **CERCLA**

---

[5] Chevron moved for summary judgment on plaintiffs' RCRA claim, but did so solely by incorporating the motions filed by CCWS and Antioch. Accordingly, the Court will analyze the RCRA claim against Chevron in connection with those motions and not in this section.

United States District Court
For the Northern District of California

1    Plaintiffs seek summary judgment against Chevron and Antioch on liability under Section 107

2    of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for

3    response costs.  In December 2001 there was a slope failure in the south bank of Markley Creek, which

4    caused buried solid and hazardous waste along the Creek to be revealed on plaintiffs' properties.  On

5    January 7, 2003, the Regional Water Quality Control Board issued a Cleanup and Abatement Order

6    ("CAO") directing Antioch, Tom Gentry California Company ("TGCC"), and GBF Holdings to

7    undertake investigation and remediation of the creek.  Spaulding Decl. Ex. 28.  Plaintiffs completed

8    their purchase of the properties soon thereafter and were named responsible parties under the CAO.

9    Plaintiffs assert that the Regional Board CAO and subsequent actions eventually required

10   plaintiffs to expend over $3 million for creek remediation work, and associated investigative and legal

11   work and agency fines.  Plaintiffs have submitted the declaration of Jay Torres-Muga, the Vice-

12   President of Engineering and Land Development for plaintiffs.  (Docket No. 390).  Mr. Torres-Muga

13   states,

> Pursuant to the Cleanup and Abatement Order ("CAO") issued by the Regional Water Quality Control Board, work done to repair and restore Markley Creek included removal of certain garbage and debris from Markley Creek, regrading and restoration of the Markley Creek channel and banks, the addition of clean fill into the Markley Creek channel and banks, and remediation of a twenty-foot buffer area along the top of the creek bank on either side of the creek.
>
> This work was performed by a contractor supervised by the City of Antioch, but was paid for by both Antioch and Plaintiffs under an interim cost-sharing agreement.
>
> In late 2008, after the Creek work was almost completed, the City of Antioch conducted activities to remove surface garbage on Parcel 34 at its own expense, although it left large amounts of garbage in a "wedge" along the Creek which remains to this day.
>
> The Regional Board CAO and subsequent actions eventually required Plaintiffs to expend over $3 million for Creek remediation work, and associated investigative and legal work and agency fines, for the Properties.  Of this amount, Plaintiffs' share of the costs allocated by the Cost-Sharing Agreement exceeded $2.4 million, as set forth in Plaintiffs' Rule 26 Disclosures.
>
> All investigation and remedial work related to solid waste contamination of the Properties has been undertaken pursuant to, and in conjunction with, government agency directives. Plaintiffs' attorneys have reviewed and commented on submissions by other responsible parties in an effort to ensure adequate implementation of the Remedial Action Plan.  Plaintiffs have paid for this work.

4

Torres-Muga Decl. ¶¶ 6-9, 13.[6] Plaintiffs have attached their Rule 26 disclosures as well as spreadsheets summarizing the invoices that plaintiffs have paid for legal work. *Id*. Ex. 3-5.

The elements of a Section 107 response cost claim are: (1) the area on which hazardous substances are found must constitute a defined "facility"; (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) the plaintiff has incurred "response costs" that are "necessary" and "consistent with the National Contingency Plan ("NCP")"; and (4) the defendant is among one of four classes of persons subject to liability. 42 U.S.C. § 9607(a)(4)(B); *Carson Harbor Village Ltd. v. Unocal Corp.*, 227 F.3d 1196 (9th Cir. 2000).

Plaintiffs move for summary judgment on the first, second and fourth elements, as well as a portion of the third element, namely that the costs incurred are "response costs." Plaintiffs contend that any determination of "necessity" or consistency with the NCP should be deferred to trial. While the Court agrees that the trial will only focus on the remaining disputed issues, the Court cannot grant summary judgment on liability as requested by plaintiffs because plaintiffs have the burden of showing, as an element of a Section 107 claim, that they have incurred "response costs" that are "necessary" and consistent with the NCP. *See Ascomb Properties Inc. v. Mobil Co.*, 866 F.2d 1149, 1154 (9th Cir. 1989) ("[I]f a plaintiff ultimately fails to show a proper response cost, then he will fail to prove his prima facie case."); *Carson Harbor Village, Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1154 n.218 (C.D. Cal. 2003) ("It is appropriate to require a CERCLA plaintiff to prove compliance with the NCP in order to survive a motion for summary judgment because damages are a fundamental component of a private party CERCLA claim, and if the recovery of damages is foreclosed because the plaintiff has failed to comply with the NCP, there is no need to try issues of liability.").[7]

---

[6] Defendants have raised various objections to these portions of Mr. Torres-Muga's declaration. The Court makes no findings as to whether any of the costs described in Mr. Torres-Muga's declaration are in fact recoverable, and the Court recognizes that the parties hotly dispute issues related to the "wedge."

[7] Plaintiffs also assert that this Court "has utilized this same approach in prior related litigation," citing a September 8, 1999 order in *Members of the Pittsburg/GBF Landfill Respondents Group v. Contra Costa Waste Services, Inc.*, C 96-3147 SI. However, as discussed in that order, the defendants conceded three elements of the CERCLA claim, including that plaintiffs had incurred "response costs," and the only disputed question was whether the defendants were responsible parties under CERCLA.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Here, Chevron and Antioch do not dispute that they are responsible parties within the meaning of CERCLA,[8] that "hazardous substances" from solid waste disposal were found throughout the subsurface of plaintiffs' property, that the Properties are a CERCLA "facility" as a result of defendants' disposal activities, that hazardous substances have been "released" within the meaning of CERCLA, and that plaintiffs have incurred "response costs."[9]  However, plaintiffs have not shown that the costs were "necessary" or in compliance with the NCP, and at minimum there are factual disputes regarding compliance with the public participation requirement of the NCP.

Chevron also contends that it is not liable for plaintiffs' costs for remediation of Markley Creek because the area leased by Antioch for the landfill did not include Markley Creek.  Chevron further notes that it was not named as a respondent to the CAO, although Antioch was named.  The Court concludes that notwithstanding the fact that Markley Creek was outside the area covered by the lease, there are factual disputes about whether waste from Antioch's landfilling operations was placed in the creek.

Antioch contends that plaintiffs' CERCLA claims are barred because plaintiffs did not provide notice to the U.S. E.P.A. and the U.S. Attorney General, as required in CERCLA Section 113(l).  That section provides:

> Whenever any action is brought under this chapter in a court of the United States by a plaintiff other than the United States, the plaintiff shall provide a copy of the complaint to the Attorney General of the United States and to the Administrator of the Environmental Protection Agency.

42 U.S.C. § 9613(l).  Antioch asserts, and plaintiffs do not deny, that they have not provided notice to either the Administrator or the Attorney General.

Plaintiffs respond that while Section 113(l) requires that notice be provided, nothing in that

---

[8]  The Court addresses Chevron's argument that it is not responsible for costs related to the remediation of Markley Creek *infra*.

[9]  The Court has reviewed plaintiffs' Rule 26 disclosures and the spreadsheets summarizing the invoices that plaintiffs have paid for legal work.  While there does not appear to be any dispute that the costs incurred in remediating Markley Creek constitute "response costs," the Court cannot conclude, on this factual record, that all of the claimed costs qualify as "response costs."  For example, legal and expert fees and costs are only recoverable as "response costs" if they are "closely tied to the actual cleanup."  *Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1577 (9th Cir. 1994).  At least some of the claimed fees and costs – such as fees related to "emails with clerk of court re defendants' failure to file non-oppositions" – would not appear to meet this standard.  Torres-Muga Decl. Ex. 5 at 25.

section or elsewhere in CERCLA provides a time frame for such notice, or bars a CERCLA claim if notice is not provided. Plaintiffs note that Antioch does not cite any authority in support of its assertion that failure to provide notice bars a claim, and Antioch concedes that there is a "paucity of precedent interpreting section 113(l)." Opposition at 3:6. The Court agrees with plaintiffs that nothing in the plain language of Section 113(l) bars a CERCLA claim for failure to provide notice. In the absence of any authority so holding, the Court finds Antioch's argument lacks merit. *Cf.* 42 U.S.C. § 6972(b)(1)(B) (RCRA notice provision stating, *inter alia*, that "No action may be commenced . . . prior to 60 days after the plaintiff has given notice of the violation to [different entities]"); *Halstrom v. Tillamook County*, 493 U.S. 20, 31 (1989) ("[W]e hold that the notice and 60-day delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision; a district court may not disregard these requirements at its discretion.").

Accordingly, the Court GRANTS in part and DENIES in part plaintiffs' motion for summary judgment on the CERCLA Section 107 response cost claim. The Court GRANTS the motion to the extent that defendants have not contested the elements of that claim, as discussed above. At trial, in order to prevail on this claim, plaintiffs will need to establish that the fees and costs sought are "response costs" that were "necessary" and consistent with the NCP. The Court finds Chevron may be held liable for the Markley Creek remediation costs, and the Court rejects Antioch's argument about failure to provide notice.

### B.    Private continuing nuisance

#### 1.    Chevron

Plaintiffs and Chevron have filed cross-motions for summary judgment on plaintiffs' private continuing nuisance claim.[10] Both must be DENIED.

A nuisance is anything "which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479. The elements of plaintiffs' claim for nuisance are: (1) plaintiffs

---

[10]  During the course of briefing, Chevron abandoned its argument that plaintiffs' claims are really for permanent nuisance and trespass, and accordingly the Court does not address this issue.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

own the properties, (2) defendants created a condition that is an obstruction to the free use of the properties, (3) the condition has interfered with plaintiffs' use or enjoyment of the properties, (4) plaintiffs did not consent to defendants' conduct, (5) an ordinary person would be reasonably annoyed or disturbed by defendants' conduct, (6) plaintiffs were harmed, (7) defendants' conduct was a substantial factor in causing plaintiffs' harm, and (8) the seriousness of the harm outweighs the public benefit of defendants' conduct. *Yamagiwa v. City of Half Moon Bay*, 423 F. Supp. 2d 1036, 1101 (N.D. Cal. 2007) (citing California Jury Instructions - Civil 2021).

The Court concludes that there are factual disputes as to whether the solid waste on the Properties has interfered with plaintiffs' use and enjoyment of the Properties, and relatedly whether plaintiffs have been harmed and if defendants' conduct was a substantial factor in causing that harm. Chevron contends that numerous other factors, and not the presence of garbage, have prevented plaintiffs from developing the Property. Chevron also contends that there is no continuing nuisance because by December 2008, Antioch had removed all municipal garbage from Parcel 34. Plaintiffs respond that the solid waste has prevented them from developing the property, and that even after December 2008, waste remains in a "wedge" along the Creek that is interfering with plaintiffs' plans to develop the land. There is evidence in the record supporting both positions, and accordingly the Court DENIES summary judgment.

Chevron also contends that it cannot be held liable because there is no evidence (or allegations) that Standard Oil actively participated in Antioch's landfill operation on the Property. Chevron asserts that "there is no case holding a lessor liable in nuisance or trespass where the landlord was not an active participant in the tortious conduct." Reply at 11:19-20. Chevron relies on *Resolution Trust Corporation v. Rossmoor Corporation*, 34 Cal. App. 4th 93 (1995), in which property owners brought an action for nuisance, trespass, and negligence against adjoining property owners, based on the contamination of plaintiffs' property by fuel leaks originating from a leased gas station on the adjoining property. The trial court granted a nonsuit to defendants on the ground that there was no evidence that lessor landlord had actively caused or created the contamination. The evidence showed that the landlord promptly remedied the leaks, while the evidence failed to show that defendants knew or should have known that adjoining property was damaged or was likely to be damaged when they learned of the leaks. The court

United States District Court

For the Northern District of California

also found that even if the landlord had breached a duty to the plaintiffs, the plaintiffs had failed to show the breach caused its injury.

*Rossmoor* is inapposite because here, the nuisance – allegedly improperly landfilled solid waste – was expressly permitted by the Standard Oil/Antioch lease. Thus, unlike the lessor landlord in *Rossmoor* who did not have any knowledge of the nuisance and did not participate in the creation of the nuisance, here arguably Standard Oil "actively participated" in the creation of the nuisance by leasing the land to Antioch for the express purpose of landfilling waste, and not removing that waste.

### 2. Antioch

For the same reasons as stated above, the Court concludes that there are triable issues of fact on plaintiffs' continuing nuisance claim against Antioch, and DENIES plaintiffs' motion. Antioch also raises the defense of consent. Antioch contends that where a property owner seeks damages for creation of a nuisance by a prior lessee, the lessee has a defense that his use of the property was lawful and was authorized by the lease. *See Mangini v. Aerojet General Corp.*, 230 Cal. App. 3d 1125, 1138 (1991). However, the parties dispute whether Antioch's landfilling operations were conducted in violation of the terms of the lease and thus outside the scope of the consent granted by Standard Oil. The parties have submitted competing expert declarations on this issue, and each side has objected to the other side's expert declarations on evidentiary grounds. The Court finds that the parties' objections go to the weight and not the admissibility of the expert opinions, and that the competing declarations raise a triable issue of fact as to whether Antioch's landfilling operations in 1957-1958 exceeded the scope of the consent granted by Standard Oil.

### C. Continuing trespass

The elements of a continuing trespass claim are similar to a continuing nuisance claim, and the parties' arguments about these claims largely mirror the contentions discussed above. Because the Court concludes that there are disputes of fact as to harm, the Court DENIES summary judgment.

In addition, while plaintiffs agree that Antioch can raise a consent defense to the nuisance claim, plaintiffs contend that no such defense is available on a continuing trespass claim if the alleged trespass

continues after consent is terminated.  *See Mangini v. Aerojet General Corp.*, 230 Cal. App. 3d 1125, 1141-42 (1991) ("A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land '(a) with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated'") (quoting Rest. 2d Torts § 160 (1965)).  Here, plaintiffs claim that Antioch placed solid waste on its property, and that regardless of whether Standard Oil originally consented to the landfilling, such consent has been terminated.  The Court agrees that Antioch may not raise consent as a defense to the continuing trespass claim.

### D.    Negligence and negligence per se (against Antioch)

Plaintiffs move for summary judgment on their negligence claims against Antioch.  Plaintiffs assert that they are entitled to a presumption of negligence – negligence *per se* – because Antioch violated Sections 5411 and 117555 of the California Health & Safety Code.  Antioch opposes summary judgment on several grounds.  Antioch contends that Section 5411 is inapplicable because that section relates only to sewage, and that there was no violation of Section 117555 because consent is a defense.

Section 5411 provides that "[n]o person shall discharge sewage or other waste, or the effluent of treated sewage or other waste, in any manner which will result in contamination, pollution or a nuisance."  Cal. Health & Safety Code § 5541.  Plaintiffs argue that the plain language of the statute applies here because it prohibits the discharge of "other waste," and municipal waste from a landfill is "other waste."   However, Section 5541 is contained within "Division 5: Sanitation," "Part 3: Community Facilities," "Chapter 6: General Provisions With Regard to Sewers," and "Article 2: Sewage and Other Waste."  Neither party addresses the statutory context or legislative history of Section 5541, or cites any authority interpreting Section 5541.  The Court is inclined to agree with Antioch that Section 5541 does not apply in this context.  The Court DENIES plaintiffs' motion for summary judgment on the negligence claims to the extent they are premised on a violation of Section 5541.  However, if plaintiffs are able to locate authority showing that Section 5541 applies to landfill waste, the Court will reconsider this ruling.

With regard to Section 117555, Antioch is correct that this section only prohibits disposal of

10

waste on private property if the disposal was done without consent.  As discussed above, there are disputes of fact as to whether Antioch's landfilling exceeded the scope of its lease.  Accordingly, summary judgment is inappropriate.  Further, the Court finds that there are disputes of fact as to damages, and thus DENIES plaintiffs' motion.

**E.    Inverse condemnation (against Antioch)**

Plaintiffs allege a claim for inverse condemnation against Antioch.  To establish this claim, plaintiffs must show (1) they have an interest in real or personal property, (2) the government substantially participated in planning, approval, construction or operation of the public project or public improvement, (3) plaintiffs' properties suffered damage, and (4) the government's project act or omission was a substantial cause of damage.  *See Yamagiwa*, 523 F. Supp. 2d at 1088.

Antioch opposes summary judgment on several grounds. First, Antioch contends that plaintiffs' damages are moot because Antioch has remediated the Properties and thus the damage has been repaired and is no longer compensable.  However, as discussed above, plaintiffs claim that the "wedge" of garbage that remains in the creek is still harming the Properties, and there are numerous issues of fact surrounding the "wedge."  In addition, inverse condemnation can be temporary, and plaintiffs can be compensated for the loss of the temporary "taking," that occurred between 2003 when plaintiffs acquired the contaminated property and 2008-2009 when Antioch completed the remediation work. *See Sacramento & San Joaquin Drainage Dist. v. Goehring*, 13 Cal. App. 3d 58, 66 (1970).

Antioch also raises a consent defense, and cites cases which stand for the proposition that the leasing of property to a public agency will preclude subsequent inverse condemnation claims for foreseeable damage resulting from that use.  *See, e.g., Reinking v. County of Orange*, 9 Cal. App. 3d 1024, 1031 (1970) ("By entering into a lease permitting the County to use the property for a sanitary fill, plaintiffs consented to such damage to the property as could be reasonably anticipated from the natural and ordinary operation of the sanitary fill, but they are not precluded or estopped to claim damage which neither they, the county, nor any other reasonable person, would have anticipated.").  Plaintiffs argue that *Reinking* is distinguishable because the *Reinking* plaintiff gave consent and leased his land to the county, whereas here plaintiffs were not a party to the Standard Oil/Antioch lease, and

11

thus these plaintiffs did not consent.  However, neither side has cited any authority on the question of whether a prior landowner's consent can be binding on subsequent landowners with regard to an inverse condemnation claim.

The Court DENIES plaintiffs' motion for summary judgment on this claim because there are disputed issues of fact as to whether plaintiffs have been damaged in the past by the presence of surface contamination, or continue to be damaged by the "wedge."  In addition, it is unclear whether Antioch may raise consent as a defense; if this case proceeds to trial, the parties are directed to research this question.[11]

### F.        Nondisclosure (against Chevron)

In 1966, Standard Oil sold 450 acres to Tom Gentry.  The 450 acres included the 4 acres that Antioch had previously leased from Standard Oil for disposal of garbage and refuse.[12]  The sale was documented by a grant deed and a letter agreement, both dated January 25, 1966.  Green Decl. Ex. 5, 6.  The letter agreement, signed by Tom Gentry, states:

> In connection with my purchase of a portion of Standard's "Los Medanos Reservoir Site," described in your deed to me of today's date, and as part of the consideration for said property, this will confirm that I am purchasing the property, including the old reservoir, without warranty of condition of fitness for any use or purpose whatsoever or any other representation or warranty, express or implied, on the part of Standard or anyone purporting to represent Standard.

*Id.* Ex. 6.  Plaintiffs purchased the Subject Property, which includes the 4 acre parcel, on November 21, 2003 from the Tom Gentry California Company ("TGCC").  As discussed in the previous summary judgment order, at the time of the sale TGCC assigned its claims to plaintiffs.  There is no evidence that Tom Gentry separately assigned any claims to plaintiffs.  Plaintiffs allege that at the time of the sale, Standard Oil "failed to disclose the prior use of the Property as a dump site," that TGCC was "unaware of the hazardous substances" on the Property, and that plaintiffs, as assignees of TGCC, have been

---

[11]  In addition, plaintiffs did not respond to Antioch's arguments that the tolling agreement did not toll constitutional claims like inverse condemnation, and that claim is barred by statute of repose.  These issues will need to be resolved at trial.

[12]  That 4 acre area is currently referred to as Parcel 34.  At the time, it was considered part of a larger 24 acre parcel referred to as Parcel 1.

12

United States District Court
For the Northern District of California

1    damaged as a result.  Master Compl. ¶¶ 169-72.

2          Chevron contends that plaintiffs' nondisclosure claim fails for numerous reasons.  First, Chevron

3    contends that plaintiffs lack standing because a nondisclosure claim is personal in nature and does not

4    run with the land.  Thus, absent an assignment of a nondisclosure claim, a subsequent purchaser of the

5    property may not pursue a claim for nondisclosure.  Plaintiffs respond that it is undisputed that Tom

6    Gentry was the founder of TGCC, and that although Tom Gentry purchased the land in his individual

7    capacity, that TGCC held title to the property at the time of the sale to plaintiffs in 2003.  Plaintiffs

8    argue that all reasonable inferences are that TGCC owned the applicable claim for nondisclosure, and

9    that this claim was assigned to plaintiffs.  Plaintiffs do not cite any evidence suggesting that there was

10   an assignment of claims, and indeed plaintiffs state that "[t]here is no evidence that Mr. Gentry knew

11   of the potential non-disclosure claim prior to being incapacitated[13] – it would be illogical to argue that

12   he was required to assign a claim that no one knew existed."  Opposition at 17:15-17.

13         The Court agrees with defendants that a claim of nondisclosure is personal to the purchaser, and

14   does not run with the land.  *See Warren v. Watkins*, 123 Cal. App. 649, 650 (1932) (subsequent

15   purchasers could bring claims for fraud and misrepresentation arising out of real estate purchase only

16   because they had received assignment from original purchasers).  However, even if Gentry's

17   nondisclosure claim was assigned to plaintiffs, Chevron is entitled to summary judgment because

18   plaintiffs cannot establish various elements of that claim.

19         The parties debate whether Standard Oil had a duty to disclose the landfill debris to Gentry when

20   he purchased the land.  Chevron notes that at the time of the sale in 1966, there was no statutory or

21   regulatory duty to disclose the existence of a former landfill, and that disclosure of prior uses was not

22   part of industry custom and practice on real estate transactions in the 1960s.  In any event, even

23   assuming Standard Oil had a duty to disclose the landfill debris, plaintiffs have not raised a triable issue

24   of fact as to either breach of that duty or causation.

25         With regard to breach, it is undisputed that the only person who would know if Standard Oil

26   disclosed the prior landfill use is Tom Gentry.  It is also undisputed that Tom Gentry died in 1998

27

28         ───────────────────

           [13]  In 1994 Mr. Gentry went into a coma after a boating accident, and he died in 1998.

                                                    13

United States District Court
For the Northern District of California

without ever complaining of nondisclosure.  Plaintiffs rely on the testimony of Norman Dyer, Tom Gentry's chief architect in the 1960s and the only available, living witness with knowledge of the sale. Plaintiffs cite Mr. Dyer's testimony for the proposition that no information or documents were provided to Gentry about the presence of garbage on the 4 acres.  However, what Mr. Dyer actually stated in his deposition was that he did not know whether Gentry ever received any information about the presence of the landfill on Parcel 1.  Dyer depo. at 46-53.  Although Mr. Dyer worked closely with Gentry as his chief architect, Mr. Dyer was not involved in the negotiations regarding the purchase of the 450 acres. *Id*. at 22.  Plaintiffs also rely on the declaration of A. Joseph Fadrowsky, the current president of TGCC, in which he states he has not located any document indicating that Standard Oil disclosed the existence of the landfill to Gentry, and that "had Tom Gentry known that Parcel 034 served as a landfill, the Gentry Company files would have had a record of it."  Fadrowsky Decl. ¶ 6.  However, at his deposition – taken just two months prior to the date that the declaration was signed – Mr. Fadrowsky testified that he did not know whether Tom Gentry had ever maintained a file regarding the 1966 purchase. Fadrowsky depo. at 139-40.  Indeed, when asked "Is information that Parcel 1 was used as a landfill or contained trash information that Mr. Gentry would hold on to?" Mr. Dyer responded "I think he'd keep it in his mind, but I don't think he necessarily would have it in a file somewhere."  Dyer depo. at 46.

On this record, there is simply no evidence showing that Standard Oil failed to disclose the landfill to Gentry.  The only contemporaneous evidence also suggests there was no breach.  The letter agreement between Gentry and Standard Oil confirmed that Gentry was "purchasing the property, including the old reservoir, without warranty of condition or fitness for any purpose whatsoever or any other representation or warranty, express or implied, on the part of Standard or anyone purporting to represent Standard."  Green Decl. Ex. 7.  Because plaintiffs bear the burden of proving breach, and because there is no evidence of breach, Chevron is entitled to summary judgment.

In addition, even if plaintiffs could show a duty and breach, the nondisclosure claim fails for lack of causation.  To establish causation, plaintiffs must show that Gentry was unaware of the prior landfilling on Parcel 34, and that if he had known about it he would not have purchased the property. *See Newhall Land & Farming Co. v. Superior Court*, 19 Cal. App. 4th 334, 350 (1993).  The fundamental evidentiary problem for plaintiffs is, again, that the only person who knows what Mr.

United States District Court
For the Northern District of California

Gentry would have done is Mr. Gentry.  Plaintiffs again rely on the declaration of Mr. Fadrowsky, in which he speculates that he thinks it is "probable that Tom Gentry would not have purchased Parcel 034 had he known that Parcel 034 had served as a landfill or contained trash and/or municipal waste, or that Parcel 034 would have been carved out of the purchase."  Fadrowsky Decl. ¶ 9.  However, Mr. Fadrowsky's opinion is speculative and without foundation.  Moreover, Mr. Fadrowsky assumes that Parcel 34 could have been carved out of the transaction.  To the contrary, Mr. Dyer (whose testimony on this point is also speculative, though less so since he is the only available living witness with knowledge of the transaction) testified that "Gentry was buying 450 acres, not Parcel 1.  Parcel 1 was part of the 450 acres.  It was not looked at as separate properties at that time, I believe."  Dyer depo. at 57.  Mr. Dyer testified he believed that Gentry would have purchase the 450 acres regardless of whether he knew about landfill debris on the 4 acre area "because it's a small piece in a big overall development."  *Id.* at 53.  Plaintiffs' counsel repeatedly asked Mr. Dyer whether knowledge of the landfill would have affected Mr. Gentry's decision to purchase the 450 acres, and Mr. Dyer repeatedly answered "no."  *Id.* at 53, 57, 120.

Accordingly, the Court DENIES plaintiffs' motion and GRANTS Chevron's motion as to the nondisclosure claim.

## II.   Antioch's motion for summary judgment on RCRA claim (378); CCWS's motion for summary judgment on RCRA claim (351)

Antioch and the CCWS defendants[14] move for summary judgment on plaintiffs' claims for injunctive relief under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k.  RCRA provides for injunctive relief and attorneys' fees and costs, but does not provide any monetary relief.  In order to obtain injunctive relief under RCRA, plaintiffs must show that the contamination "may present an imminent and substantial endangerment to health or the environment." *Mehrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996) (quoting 42 U.S.C. § 6972(a)).

---

[14]   A number of defendants have joined in these motions.  Plaintiffs have also moved for summary judgment on their RCRA claims as they relate to groundwater and soil gas contamination.  The Court will address the RCRA claims as they relate to groundwater and soil gas contamination in the next section.

United States District Court
For the Northern District of California

**A.    Antioch**

Antioch moves for summary judgment on plaintiffs' RCRA claims relating to groundwater and soil gas contamination on the ground that there is no evidence that Antioch is responsible for that type of contamination.  Although plaintiffs assert that "defendants" are responsible for groundwater and soil gas contamination, they have not identified any evidence linking Antioch to this type of contamination, and indeed plaintiffs' own motion on this question and all the evidence submitted by plaintiffs on groundwater and soil gas contamination relates to other defendants.  The Court finds that there is no dispute of material fact on this point, and GRANTS Antioch's motion for summary judgment on plaintiffs' RCRA claims relating to groundwater and soil gas contamination.

Antioch also moves for summary judgment on plaintiffs' RCRA claims relating to surface contamination.  Antioch contends that it is entitled to summary judgment on these claims because Antioch has removed all waste from Parcel 34 "Area D," and because the remediation of Markley Creek has been completed pursuant to the Regional Board's 2003 CAO.  Antioch contends that as a result of the remediation, plaintiffs cannot demonstrate that they are entitled to injunctive relief under RCRA because there is no "imminent and substantial endangerment to health or the environment."

Plaintiffs contend that there is an imminent and substantial endangerment posed by the current presence of a "wedge" of waste and debris.  Antioch contends that plaintiffs are not entitled to relief under RCRA because the wedge design was approved by the Regional Board.  Plaintiffs argue that the Regional Board did not approve the wedge, and that the wedge nevertheless presents an "imminent and substantial endangerment" to health or the environment, and has submitted an expert declaration to that effect.  *See* Isham Decl. ¶¶ 18-25.[15]

The Court requested and received supplemental briefing on the issue of the "wedge," and that briefing demonstrates that there are numerous factual disputes as to whether the "wedge" as constructed was in fact approved and/or permitted by the Regional Board, as well as whether the "wedge" presents an "imminent and substantial endangerment," and thus the Court cannot grant summary judgment.  Antioch does not cite any affirmative evidence that the wedge does not present a risk.  Even assuming

---

[15]  The Court finds that defendants' objections to Mr. Isham's testimony go to the weight and not admissibility.

United States District Court
For the Northern District of California

Antioch is correct that the Regional Board approved the "wedge" that remains on the property, Antioch concedes that the approval does not mean that, as a matter of law, there is no danger to health or the environment.  Instead, Antioch argues that the Regional Board's approval of the wedge would be "relevant" to the question of imminent and substantial endangerment.   Plaintiffs have submitted contrary evidence, thus raising a triable issue of fact.  *Cf. Price v. United States Navy*, 39 F.3d 1011, 1020 (9th Cir. 1994) ("Although Mr. Vitale and Mr. Scandura testified that contaminants probably remain underneath the home at 6025 Edgewater, they both agreed that there is no imminent and substantial endangerment at the present time because of the concrete barriers.  Moreover, the State certified that all appropriate response actions had been completed and that no further removal/remedial action is necessary.").  Accordingly, the Court DENIES Antioch's motion on the RCRA claims as they relate to surface contamination.

### B.    CCWS

The CCWS defendants also move for summary judgment on the RCRA claims as they relate to surface contamination.  CCWS argues that plaintiffs do not claim, and have not submitted any evidence showing, that the "wedge" is attributable to CCWS.  On this point, CCWS cites the deposition testimony of Jay Torres-Muga of SPPI.  In response to a question about where the "wedge" garbage originated from, Mr. Torres-Muga stated "I don't know where it came from."  Torres-Muga depo. at 75:10-11. However, plaintiffs have also submitted evidence showing that the surface contamination originated from either the Pittsburg or Antioch landfills, and the CCWS defendants are linked with the Pittsburg landfill.  The Court finds that there are triable issues of fact as to whether the CCWS defendants are responsible for the "wedge," and thus DENIES CCWS's motion on the RCRA claims as those claims concern surface contamination.

### III.    Plaintiffs' motion re RCRA, CERCLA and state law claims (386); CCWS's motion on RCRA (351) regarding groundwater and soil gas contamination

### A.    RCRA

The parties have filed cross-motions for summary judgment on plaintiffs' RCRA claims as they

relate to groundwater and soil gas contamination. Plaintiffs claim that solid and hazardous wastes were deposited in, and released from, the GBF and Pittsburg Landfills, and are contained in the toxic groundwater plume underneath plaintiffs' properties.

The Landfill is already the subject of ongoing remediation efforts. In 1993, the California Department of Toxic Substances ("DTSC") issued a Remedial Action Order requiring various potentially responsible parties to undertake an investigation of contamination at the Landfill. In 1997, the DTSC issued a Remedial Action Plan ("RAP") for the Landfill. The RAP called for a groundwater pump-and treat system with extraction wells both near the Landfill and near the leading edge of the contaminant plume, installation and maintenance of a landfill cap, modification and maintenance of the landfill gas system, and groundwater monitoring. Habib Decl. Ex. 20 (RAP at 25). The RAP states that the purpose of the landfill cap was to "minimize the amount of water able to migrate through the landfill material and leach contaminants into the groundwater." *Id*. The purpose of the extraction wells was to "control further migrations of contaminants in the groundwater." *Id*. The RAP also provides that the cleanup standards for groundwater were cleanup "to background" or at a minimum to maximum contaminant levels ("MCLs"). *Id*. at 16.[16]

GBF began remediating the Landfill in 2001 under DTSC's supervision pursuant to a Consent Order which incorporated the RAP. In 1996, some of the parties that sent waste to the Landfill for disposal brought suit before this court against the entities who owned and operated the Landfill to achieve an allocation of cleanup costs among the parties. *Members of the Pittsburg/GBF Landfill Respondents Group v. Contra Costa Waste Services, Inc.*, C 96-3147 SI ("*CCWS Case*"). The *CCWS Case* settled in 2001. The settlement involved the parties to the *CCWS Case* paying various amounts into a settlement fund, the proceeds of which were transferred to GBF. Through various contractual mechanisms, GBF has assumed sole responsibility for remediating the Landfill. Wilson Decl. ¶ 3. On July 13, 2001, GBF entered into a Consent Order with DTSC. Habib Decl. Ex. 6 (Consent Order). GBF is the sole respondent under the Consent Order. *Id*.

---

[16] Cleanup "to background" means to clean up until concentrations of the chemicals of potential concern can no longer be detected using standard laboratory techniques. Cleanup to MCLs means to clean up until concentrations of the chemicals of potential concern are lower than the maximum level allowed in drinking water under federal and state standards.

United States District Court
For the Northern District of California

The Consent Order requires GBF to, *inter alia*, (1) install and maintain a landfill cap, (2) design and install a groundwater extraction and treatment system at the downgradient edge of the Landfill, (3) modify and maintain a landfill gas system, (4) install additional groundwater monitoring wells and conduct groundwater monitoring, and (5) design and install a groundwater extraction and treatment system at the downgradient edge of the offsite plume or submit a request for modification of this offsite remedy. *Id.* Since 2001, TRC (on behalf of GBF) has worked under the supervision of DTSC and the Regional Water Quality Control Board and implemented the measures approved by those agencies under the Consent Order, relative to the groundwater contamination. Wilson Decl. ¶ 8; *see generally id.* at ¶¶ 8-14 (describing measures implemented by TRC).

In May 2006, GBF submitted a request for modification of the offsite remedy on the grounds that monitored natural attenuation ("MNA") would be a more appropriate remedy than the offsite remedy called for in the RAP. *Id.* ¶ 15. MNA uses bacteria existing in the subsurface to naturally bioremediate contamination. In response to GBF's request for modification, the DTSC requested that TRC evaluate several different remedial options for the offsite plume. *Id.* ¶ 16. On November 16, 2007, TRC turned in its Groundwater Remedial Alternatives Evaluation to the DTSC. *Id.* ¶ 17. At a meeting between DTSC and TRC on November 26, 2007, DTSC requested that additional sampling and analysis of MNA parameters be conducted. *Id.* On September 26, 2008, TRC submitted its Addendum to Groundwater Remedial Alternatives Analysis, which included the additional sampling and analysis. *Id.* In a memorandum dated October 8, 2008, DTSC stated that "MNA is likely to be an appropriate remedial alternative for the downgradient residual plume remedy." *Id.* DTSC also recommended five revisions to the Groundwater Remedial Alternative Evaluation, and on March 23, 2009, TRC submitted a Revised Groundwater Remedial Alternative Evaluation incorporating those recommendations. *Id.* The DTSC now has the issue under submission.

RCRA authorizes any person who has provided the statutorily required notice of intent to commence a civil action

> against any person, including the United States . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . .

42 U.S.C. § 6972(a)(1)(B).  RCRA provides for injunctive relief and attorneys' fees and costs, but does not provide for monetary damages or cleanup costs.  With regard to injunctive relief, RCRA states,

> The district court shall have jurisdiction . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both . . . .

*Id*. at § 6972(a).  The master complaint seeks an injunction compelling defendants to "implement the measures necessary to abate the endangerment to health and the environment to the satisfaction of the [California Department of Toxic Substances], the Regional Water Quality Control Board, and any other regulatory agencies that may assert jurisdiction over the abatement of hazardous conditions at the Property."  Master Compl. at 31.

Defendants contend that plaintiffs' RCRA claim is barred because plaintiffs are asking the Court to engage in an idle act because GBF is already complying with the remedial directives of the DTSC pursuant to the Consent Order.  Defendants note that DTSC has jurisdiction over hazardous substances cleanups in California pursuant to the California Health & Safety Code and the federal CERCLA statute.  Cal. Health & safety Code §§ 25300 *et seq.*; 42 U.S.C. § 9604(c)(3); *see also City of Lodi v. Randtron*, 118 Cal. App. 4th 337, 351 (2004).  Because the Landfill has been listed as a hazardous substance release site by DTSC pursuant to the California Hazardous Substance Account Act ("HSAA"), all action with respect to the hazardous substances releases must comply with the HSAA.  *City of Lodi*, 118 Cal. App. 4th at 353 ("DTSC is charged 'with sole responsibility for ensuring that required action in response to a hazardous substance release or threatened release at a listed site is carried out in compliance with the procedures, standards, and other requirements set forth in this chapter, and shall, as appropriate, coordinate the involvement of interested or affected agencies in the response action.'") (quoting Cal. Health & Safety Code § 25356).

Defendants contend that plaintiffs' RCRA claims are barred for three reasons: (1) plaintiffs lack constitutional standing because plaintiffs seek an order that will not redress the harm they allege; (2) plaintiffs are not entitled to injunctive relief because they cannot demonstrate irreparable harm; and (3) under the primary jurisdiction doctrine, the administrative forum provided by DTSC is the appropriate forum for resolution of plaintiffs' claims regarding the cleanup of the offsite groundwater plume.  The

gravamen of all three arguments is that plaintiffs are already receiving the relief they seek – remediation of the groundwater plume – through TRC/GBF's implementation of the Consent Order and RAP pursuant to the oversight of the DTSC.

Plaintiffs argue that the RCRA claims are not barred because the DTSC is not addressing the vapor intrusion issues on plaintiffs' property caused by defendants' groundwater plume. Plaintiffs argue that the DTSC's RAP assumed that the properties to the north of the landfill that were then undeveloped (including plaintiffs' property) would remain undeveloped. Plaintiffs argue that, as a result, the RAP did not consider the indoor health risks from groundwater contamination *if the property was developed*, and plaintiffs assert that the actual remedial work being performed at the landfill site is not lessening the vapor intrusion risk. Plaintiffs contend that the Court can design injunctive remedies to address plaintiffs' injuries without conflicting with ongoing DTSC efforts. Plaintiffs argue that the Court can order defendants to immediately undertake the site-specific soil gas and other health risk assessment investigation studies necessary to quantify and address these risks, can order defendants to implement additional site-specific remedies that would contain further spread of the plume and decrease chlorinated solvent concentrations, and order affirmative injunctive relief requiring defendants to fund and implement necessary mitigation measures under plaintiffs' buildings to protect occupants from indoor vapor intrusion dangers.

Defendants respond that the purported deficiencies identified by plaintiffs, and the proposed injunctive relief, were not pled in the master complaint. Defendants note that plaintiffs do not request, or even mention, indoor air intrusion mitigation measures in the master complaint. Defendants also argue that the RAP never considered vapor intrusion issues on the property because the property was vacant and there were no plans to develop it – and defendants argue that nothing has changed in this regard because plaintiffs still has no concrete plans to develop the Property.

The Court agrees with defendants that plaintiffs' RCRA claims fail and thus that defendants are entitled to summary judgment. There are two fundamental problems with plaintiffs' RCRA claims. First, the Consent Order already requires GBF/TRC to clean up the groundwater contamination, and that remediation has been underway for years. Plaintiffs seek relief that is already been provided outside of this lawsuit, and aside from the alleged vapor intrusion issues discussed *infra*, plaintiffs "ha[ve]

**United States District Court**
For the Northern District of California

identified nothing whatsoever that this Court could order defendant to do to supplement [already existing remediation] efforts." *87th St. Owners Corp. v. Carnegie-Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1220-21 (S.D.N.Y 2002) (dismissing RCRA claim as moot due to ongoing state-supervised cleanup addressing contamination). That the RCRA claim is superfluous is demonstrated by the relief sought by the complaint, which is simply an order directing defendants to implement remedial measures to the satisfaction of the DTSC and any other regulatory agencies that "may assert jurisdiction" over the abatement of hazardous conditions at the property. Whether this is viewed as a lack of standing because the harm will not be redressed by this Court, or as a failure to demonstrate entitlement to relief under RCRA, the problem is the same: there is no basis for the relief plaintiffs seek because the contamination is already being addressed by the DTSC through the Consent Order and the RAP. *See Glanton v. AdvancePCS, Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) ("There is no redressability, and thus no standing, where . . . any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume to control or to predict.'") (internal citation omitted); *87th St. Owners*, 251 F. Supp. 2d at 1220-21; *Kara-Holding Corp. v. Getty Petroleum Mktg.. Inc.*, 99 Civ. 0275 (RWS), 2004 WL 1811427, at *11 (S.D.N.Y. Aug. 12, 2004) (granting defendants summary judgment on RCRA claim where "Kara has not shown that the remediation plan proposed by the plaintiffs is necessary to insure that the petroleum contamination is no longer an imminent and substantial endangerment in light of the considerable remediation that has already taken place.").

Plaintiffs contend that the current remediation plan does not address the danger posed by vapor intrusion, and thus that the RCRA injunctive relief is not superfluous. There are a number of problems with this assertion. First, even if the Court granted the relief that plaintiffs describes in their papers regarding soil vapor, such as ordering TRC to conduct a study of the site-specific soil gas conditions, DTSC would necessarily be involved in that process, and would make the determination as to whether mitigation was necessary. Plaintiffs concede as much. *See* Cullen Decl. ¶¶ 41-42 ("soil vapor investigation will include interaction with DTSC as the regulatory oversight agency, the development of a workplan, implementation of a side-wide soil vapor investigation, and reporting the results").

More importantly, the alleged soil vapor danger only exists *if* plaintiffs develop the property, and all of the evidence submitted by plaintiffs on about vapor intrusion risks is contingent on development.

1    *See* Spence Decl. ¶ 6 ("I explained the human health risks from vapor intrusion that were present for

2    the *planned development* of Plaintiff's West Coast and SPPI Properties . . . ."). If and when plaintiffs

3    develops their property, plaintiffs can approach the DTSC about this issue. Plaintiffs do not contend

4    that there is any current danger posed by soil vapor (and even if it did, DTSC would address it). In order

5    to obtain injunctive relief under RCRA, plaintiffs must show an "imminent and substantial

6    endangerment" to health or the environment. 42 U.S.C. § 6972(a).

7    The Supreme Court has said that the language of the RCRA " 'implies that there must be a threat

8    which is present now, although the impact of the threat may not be felt until later.' " *Meghrig v. KFC

9    Western, Inc.*, 516 U.S. 479, 486, (1996) (quoting *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th

10   Cir. 1994)). Only if injury is "sufficiently likely" will the balance of harm tilt in favor of injunctive

11   relief. *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987). Here, the dangers

12   identified by plaintiffs all depend on future development, and there is no "imminent and substantial

13   endangerment" that can be remedied by this Court. The Court finds instructive the recent decision by

14   the Second Circuit in *Simsbury-Avon Preservation Soc. LLC v. Metacon Gun Club*, __ F.3d __, 2009

15   WL 2341924 (2d Cir. July 31, 2009). In that case, the Second Circuit found summary judgment in favor

16   of the defendants was proper on the plaintiff's RCRA claim. The court held that discarded lead at a gun

17   club site did not present an "imminent and substantial endangerment to health or environment," and thus

18   did not warrant injunctive relief under RCRA, despite the plaintiff's expert report that found that various

19   samples drawn from site exceeded state thresholds for residential sites and concluded that lead

20   represented potential exposure risk to humans and wildlife. *Id*. at *10-11. The court found that there

21   was no triable issue of fact on "imminent and substantial endangerment" where the report did not state

22   the degree of potential exposure to lead contamination on site, or provide any evidence that anyone was

23   subject to long-term exposure to lead contamination at site, or that there were realistic pathways of

24   exposure there. *Id.* That is precisely the case here. *See also Avondale Federal Savings Bank v. Amoco

25   Oil Co.*, 170 F.3d 692, 695 (7th Cir. 1999) (holding RCRA claim premature because "Avondale's own

26   expert testified that 'if excavation is ever performed under the streets adjacent to the property, petroleum

27   contamination will be found at levels requiring abatement to protect health and the environment.' Thus

28   off-site contamination may very well present an imminent and substantial danger at some point, but it

does not present such a danger right now."); *Price v. United States*, 818 F. Supp. 1323, 1325 (S.D. Cal. 1992) (if no pathway of exposure, no imminent endangerment).

Accordingly, the Court DENIES plaintiffs' motion for summary judgment on the RCRA claims as they relate to groundwater contamination and GRANTS defendants' motions on these claims.

**B.     CERCLA**

Plaintiffs seek summary judgment on liability under Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for response costs relating to groundwater, soil and surface contamination.  The elements of a Section 107 response cost claim are: (1) the area on which hazardous substances are found must constitute a defined "facility"; (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) the plaintiff has incurred "response costs" that are "necessary" and "consistent with the National Contingency Plan ("NCP")"; and (4) the defendant is among one of four classes of persons subject to liability. 42 U.S.C. § 9607(a)(4)(B); *Carson Harbor Village Ltd. v. Unocal Corp.*, 227 F.3d 1196 (9th Cir. 2000).

**1.     CCWS defendants**

CCWS contends that plaintiffs have failed to submit admissible evidence that the CCWS defendants are among a class of persons subject to liability.  Plaintiffs contend that the Garaventa defendants and the City of Pittsburg are liable as former owners, and have submitted a June 6, 1988 California Department of Public Health Services Remedial Action Order Amendment listing the named defendants as respondents.  CCWS objects to this document as hearsay, and argue that the document does not meet the public records or reports exception because the 1988 Amendment does not contain factual findings as required by FRE 803(8)(c).

The Court concludes that there is ample undisputed evidence showing that Silvio and Mary Garaventa, Silvio Garaventa Jr., PDDBS and CCWS  are former owners or operators under CERCLA. *See* Spaulding Decl. Ex. 2, 5, 9,15, 16.  The Court finds that these agency documents are not hearsay and are admissible under the public records exception.  The Court further finds that Mary Garaventa, the Garaventa Estate, and CCWS are precluded from relitigating this issue by virtue of collateral

United States District Court
For the Northern District of California

1  estoppel from the *CCWS Case*.  Spaulding Decl. Ex. 4 (September 8, 1999 order.  Accordingly,

2  plaintiffs' motion is GRANTED as to Silvio and Mary Garaventa, Silvio Garaventa Jr., PDDBS and

3  CCWS.[17]  However, there is not undisputed evidence that the Garaventa Family Trust qualifies as a

4  responsible party under CERCLA, and thus plaintiffs' motion is DENIED as to that defendant.

6  ### 2.    Federal defendants

7  Plaintiffs claim that they incurred response costs cleaning up Markley Creek, and in the form

8  of attorney and expert fees and costs related to investigation and remediation of the groundwater plume.

9  Plaintiffs contends that all investigation and remedial work related to Markley Creek has been

10 undertaken pursuant to, and in conjunction with, government agency directives and therefore is

11 recoverable.  With regard to the groundwater-related costs, plaintiffs assert that their experts have

12 examined the nature and extent of the groundwater contamination in order to ensure effective

13 remediation, and that plaintiffs' attorneys have met with regulators and reviewed submissions by other

14 responsible parties.

15 The Federal defendants contend that there are triable issues of fact as to whether the costs

16 associated with cleaning up Markley Creek were caused by any release or threatened release of

17 hazardous substances tied to the Federal defendants.  "CERCLA provides that a party that releases a

18 hazardous substance is liable for another's response costs, but only if its release caused the other party

19 to incur those response costs."  *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1182 (9th Cir. 2000).

20 Defendants argue that expert opinion indicates that the waste along the banks of the creek was deposited

21 there by the City of Antioch in connection with Antioch's landfill, and that plaintiffs have not submitted

22 any evidence that any of the Federal defendants sent waste to the Antioch landfill.  Plaintiffs do not

23 respond to this argument.  On this record, the Court cannot conclude that plaintiffs have tied the

24 Markley Creek cleanup costs to the Federal defendants, and accordingly this remains an issue for trial.

25 The Federal defendants also contend that there are triable issues of fact as to whether the

26 attorney and expert fees and costs are "response costs."  "CERCLA Section 107 does not provide for

27 _____

28 [17] As stated elsewhere in this order, plaintiffs must still show that they have recovered "response costs" that were "necessary" and in compliance with the NCP as to the CCWS defendants.

the award of private litigants' attorney's fees associated with bringing a cost recovery action." *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994). Where a private litigant's attorneys fees "have not advanced the cleanup" of the contamination, those costs are not recoverable. *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 953 (9th Cir. 2002). Similarly, expert costs incurred primarily for litigation are not recoverable. *See Louisiana-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1577 (9th Cir. 1994); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000) (expenditures on experts not "closely tied to the actual cleanup" are not necessary response costs).

Defendants contend that plaintiffs have failed to demonstrate that the sought costs are "response costs" as opposed to unrecoverable litigation costs. Plaintiffs respond that the amount of costs can be determined at trial, and that defendants' arguments regarding the recoverability of particular line items in attorney fees or consultant invoices do not go to liability but to the extent of damages, and should be addressed at trial. The Court disagrees with plaintiffs' suggested approach as plaintiffs have the burden of showing, as an element of a Section 107 claim, that they have incurred "response costs" that are "necessary" and consistent with the NCP. *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1154 n.218 (C.D. Cal. 2003) ("It is appropriate to require a CERCLA plaintiff to prove compliance with the NCP in order to survive a motion for summary judgment because damages are a fundamental component of a private party CERCLA claim, and if the recovery of damages is foreclosed because the plaintiff has failed to comply with the NCP, there is no need to try issues of liability.").

### 3. TRC/GBF and Generator defendants

These defendants also contend that plaintiffs' claimed costs are not recoverable "response costs" but simply unrecoverable litigation expenses. For the reasons stated above, the Court cannot determine on this record whether the costs qualify as "response costs," and therefore DENIES plaintiffs' motion for summary judgment on this question.

### C. Private continuing nuisance and continuing trespass (against all defendants except Federal defendants)

United States District Court
For the Northern District of California

1    Plaintiffs allege that the surface and groundwater contamination at their properties has interfered

2    with the use of their properties and constitutes a continuing nuisance and a continuing trespass.

3    Plaintiffs move for summary judgment on these claims against all defendants (except the Federal

4    defendants, who are not named in these claims).

5

6          **1.    TRC/GBF**

7    The TRC defendants argue that they cannot be held liable for the continuing nuisance and

8    trespass claims because they did not own or operate the Landfill.  However, "under California law, both

9    the parties who maintain the nuisance and the parties who create the nuisance are responsible for the

10   ensuing damages."  *Newhall Land & Farming Co. v. Superior Court*, 19 Cal. App. 4th 334, 343 (1993).

11   Plaintiffs contend that the TRC defendants are liable because they have failed to abate the groundwater

12   contamination.

13   In order to warrant summary judgment, plaintiffs must show that there are no triable issues

14   of fact as to, *inter alia*, whether defendants have interfered with plaintiffs' private use and enjoyment of

15   their property, and whether that interference was substantial and unreasonable.  CA BAJI § 8.60.  As

16   GBF/TRC notes, they have been remediating the groundwater contamination pursuant to the Consent

17   Order and RAP.  At the very least, defendants' ongoing remediation of the groundwater plume raises

18   triable issues of fact as to whether defendants have interfered with plaintiffs' use of the property and the

19   reasonableness of defendants' conduct, and thus plaintiffs' motion is DENIED.[18]

20

21         **2.    CCWS**

22   The CCWS defendants contend that there are disputes of fact as to whether each defendant was

23   negligent (or unreasonable), substantial interference, and damages.  The Court agrees that there are

24   triable issues, and DENIES plaintiffs' motion.

25

26   ─────────────────

27   [18] However, as discussed in Section VII, the Court grants summary judgment in favor of TRC
and GBF to the extent plaintiffs' continuing trespass and nuisance claims concern surface
contamination, as there are no disputes of fact regarding the alleged continuing nuisance and trespass

28   – the "wedge" – vis a vis TRC and GBF.

27

United States District Court
For the Northern District of California

### 3.      Generator defendants

The Generator defendants contend that plaintiffs' claims fail because plaintiffs cannot show that these defendants' conduct was unreasonable, reckless or negligent (for continuing nuisance) or intentional, reckless or negligent (for continuing trespass).  *See Hellman v. La Cumbre Golf & Country Club*, 6 Cal. App. 4th 1224, 1230-31 (1992) (continuing nuisance); *Wilson v. Interlake Steel Co.*, 32 Cal.3d 229 (1982) (continuing trespass).  The Generator defendants argue that the most that plaintiffs can show is that the Generator defendants sent hazardous substances and waste to the Landfill.  The Generator defendants argue that it is undisputed that they had no responsibility for the operations at the Landfill, and it is the operation of the Landfill that plaintiffs claim give rise to the groundwater contamination now existing under portions of its property.  The Generator defendants argue that plaintiffs' discovery responses confirm that the only basis for the claims against the Generator defendants is their disposal of waste at the landfills.

In response, plaintiffs raise a variety of unavailing arguments.  Plaintiffs contend that a defendant may be liable for a nuisance without negligence.  While plaintiffs are correct that negligence is not a necessary element of a nuisance claim, in the absence of negligence there must be some intentional conduct that is unreasonable.  *See Hellman*, 6 Cal. App. 4th at 1230.

> An action for private nuisance is designed to redress a substantial and unreasonable invasion of one's interest in the free use and enjoyment of one's property.  The invasion may be intentional and unreasonable.  It may be unintentional but caused by negligent or reckless conduct; or it may result from an abnormally dangerous activity for which there is strict liability.  On any of these bases the defendant may be liable.  On the other hand, the invasion may be intentional but reasonable; or it may be entirely accidental and not fall within any of the categories mentioned above.

*Id*. at 1230-31.  The cases cited by plaintiffs do not hold otherwise.  *See Shields v. Wondries*, 154 Cal. App. 2d 249, 255 (1957) ("A nuisance may not, necessarily, grow out of acts of negligence, but may be the result of skillfully directed efforts – efforts which may be skillfully directed towards others accomplishing the desired end, but which may not have due regard for the rights of others."); *see also Sturges v. Charles L. Harney, Inc.*, 165 Cal. App. 2d 306, 318 (1958) (citing *Shields* for the same proposition).  Moreover, both *Shields* and *Sturges* demonstrate that in order for liability to attach, a defendant must have intentionally done some act which caused the nuisance.  In *Shields*, the defendant property owners constructed improvements to control the flow of water on their property, and those

**United States District Court**
For the Northern District of California

improvements allegedly caused a flood on the plaintiff neighbor's property. *Shields*, 154 Cal. App. 2d at 255. In *Sturges*, the defendant failed to comply with various provisions of the city building code and negligence was established "as a matter of law." *Sturges*, 165 Cal. App. 2d at 318. In any event, the defendant was held liable for nuisance because the defendant engaged in various construction operations on his property which caused flooding and other damage to adjoining landowners. *Id.*

Plaintiffs also contend that they can hold the Generator defendants liable even though they did not own or operate the landfills. As support, plaintiffs cite *Mangini v. Aerojet-General Corporation*, 230 Cal. App. 3d 1125 (1991). However, *Mangini* simply holds that a former landowner who allegedly created the nuisance cannot escape liability on the ground that the defendant no longer holds a possessory interest. "Nor is it material that defendant allegedly created the nuisance at some time in the past but does not currently have a possessory interest in the property. [N]ot only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages." *Id.* at 1137 (internal quotations omitted). The *Mangini* court cited a number of cases and noted that "these authorities refute defendant's assertion, unsupported by authority that "one cannot be guilty of committing a nuisance unless it [ sic] is in the position to abate it."" *Id.* at 1137 n.7. In *Mangini*, the prior landowner defendant had allegedly caused the nuisance by burning and burying waste rocket fuel materials and other hazardous substances on the property. *Id.* at 1132.

Here, there is no basis for plaintiffs' nuisance and trespass claims against the Generator defendants because their conduct – disposing of their waste at the landfill – did not create or assist in the creation of the nuisance. Plaintiffs have not submitted any evidence suggesting that defendants' conduct was unreasonable. It is undisputed that the Generator defendants played no part in the operation of the Landfill, and it is undisputed that the Generator defendants' only role with respect to the Landfill was having their waste taken there for purposes of its disposal. Defendants' conduct is too attenuated from the creation of the alleged nuisance. It is true that there would be no nuisance without the disposal of solid and hazardous waste at the Landfill. However, plaintiffs claim that the *cause* of the nuisance was the improper handling of the waste at the Landfill – such as the absence of a liner, operating leachate collection system, or an operating vadose zone monitoring system at the Landfill – which is

conduct flowing from the operation of the Landfill, not from the Generator defendants' disposal of waste at the Landfill.

Accordingly, the Court DENIES plaintiffs' motion as to the Generator defendants.[19]

**D.    Negligence and negligence *per se* (against all defendants except Federal defendants)**

The Court finds that there are triable issues of fact as to plaintiffs' negligence claims, including significant disputes of fact as to whether plaintiffs have been damaged. Accordingly, the Court DENIES plaintiffs' motion.

**E.    Inverse Condemnation (against City of Pittsburg)**

Plaintiffs and CCWS have filed cross motions for summary judgment on this claim. During the course of briefing the motions, plaintiffs abandoned this claim, as they did not oppose CCWS's motion for summary judgment and did not file a reply to their own motion. Accordingly, the Court GRANTS CCWS's motion and DENIES plaintiffs' motion.

**IV.   CCWS's motion for partial summary judgment as to certain claims and as to certain defendants (357)**

**A.    Ultrahazardous activity on behalf of CCWS**

The Court's August 3, 2009 order held that plaintiffs' claims for ultrahazardous activity as those claims related to solid waste contamination were time-barred. In addition, plaintiffs concede that their claims for ultrahazardous activity are barred to the extent that they seek damages related to groundwater contamination. Accordingly, plaintiffs no longer have any claims for ultrahazardous activity against CCWS, and the Court DENIES this motion as moot.

---

[19] It does not appear that the Generator defendants filed an affirmative motion on the continuing nuisance and trespass claims (although the Generator defendants did file motions on the "solid waste" and "groundwater contamination" claims, raising different grounds for summary judgment). As such, the Court does not grant summary judgment in favor of the Generator defendants at this time. However, in light of this order and the companion order in *West Coast*, where the Generator defendants did file an affirmative motion, the Court is of the view that plaintiffs' continuing nuisance and trespass claims could not proceed to trial against the Generator defendants. The same holds for plaintiffs' continuing nuisance and trespass claims against the Prewetts, for all of the reasons stated in the *West Coast* summary judgment order.

United States District Court
For the Northern District of California

### B.     Inverse condemnation - Pittsburg

Plaintiffs have abandoned this claim and failed to oppose Pittsburg's motion for summary judgment. Accordingly, the Court GRANTS Pittsburg's motion for summary judgment on the inverse condemnation claim.

### C.     Claims against PDDBS, Sil Garaventa Jr., Mary Garaventa, Estate of Silvio Garaventa and Garaventa Family Trust

Defendants contend that various defendants are entitled to summary judgment because plaintiffs have not identified any evidence that particular defendants committed any act that was negligent or intentional. Defendants also argue that simply because a defendant owned or operated a landfill does not equate to liability. Plaintiffs respond that Silvio and Mary Garaventa, Silvio Garaventa Jr. and PDDBS are each named on three Remedial Action orders issued by the DTSC and the Cease and Desist Order issued by the Regional Water Quality Control Board regarding the landfills, and each were named as owners or operators at the time of a release of a hazardous substance. Because plaintiffs contend that it was the manner in which the landfills were operated that caused them harm, the Court concludes that there are triable issues as to these defendants' liability, and DENIES defendants' motion.

However, it appears that plaintiffs' only basis for holding the Garaventa Family Trust liable is that by August 7, 1979 it became the sole shareholder of CCWS. The Court reserves judgment on whether the Trust can be held liable under any of the claims alleged. However, the Court is skeptical that the Trust can be held liable simply on the basis that it was a shareholder of CCWS. *See, e.g.,* *Resolution Trust Corp.*, 34 Cal. App. 4th at 100 ("trespass requires an act which is intentional, reckless, negligent or the result of ultrahazardous activity"). If this case proceeds to trial, the parties are directed to address the liability of the Garaventa Family Trust in a pretrial motion in limine.

### D.     Continuing trespass and nuisance – CCWS

For the reasons stated *supra* (and as argued by the CCWS defendants in opposition to plaintiffs' motion on these claims), the Court concludes that there are triable issues of fact on plaintiffs' continuing trespass and nuisance claims against CCWS, and thus DENIES defendants' motion.

United States District Court

For the Northern District of California

**V.      CCWS's motion re groundwater contamination (353)**

CCWS moves for summary judgment on plaintiffs' claims as they relate to groundwater contamination.  Plaintiffs do not oppose the motion as to the claims for negligence, negligence per se, ultrahazardous activity, or inverse condemnation to the extent those claims relate to groundwater contamination; accordingly, the motion is GRANTED.  The remaining claims to be decided concerning groundwater contamination are continuing nuisance and trespass, and federal and state declaratory relief.

CCWS moves for summary judgment on these claims on the basis that plaintiffs have not produced any evidence that plaintiffs have suffered any damage as a result of groundwater contamination.  Plaintiffs respond that money damages are not required to recover for the torts of continuing nuisance and trespass, and that in any event they do have evidence of monetary damages. CCWS's reply concedes that money damages are not a required element of these claims, stating that "theoretically plaintiffs could proceed to trial on the issue of abatement only."  Reply at 7.  Instead, in the reply CCWS recasts its motion as one seeking to preclude plaintiffs from seeking monetary damages at trial.

CCWS argues that there is no evidence that groundwater contamination is preventing plaintiffs from developing their property, or that any specific remediation or mitigation will be required before plaintiffs can develop their property, or that plaintiffs have incurred any costs arising from groundwater contamination on their property.  Plaintiffs have submitted declarations stating that the groundwater contamination has prevented and delayed them from developing their property, as well as expert declarations concluding that plaintiffs have been damaged by the development delays.  CCWS challenges these declarations as "speculative" and "unsupported," and argues that plaintiffs' failure to develop the property is not attributable to groundwater contamination.  The Court finds that there are triable issues of fact as to whether plaintiffs have been damaged by any groundwater contamination, and thus that summary judgment is inappropriate.  The Court also finds that while particular objections to particular statements in the declarations may be well-founded, in general defendants' objections go to the weight rather than the admissibility of this testimony.  Defendants may renew specific objections to specific testimony at the time of trial.  The Court DENIES CCWS's motion.

United States District Court
For the Northern District of California

## VI.    TRC's motion re groundwater contamination (348)

The TRC defendants move for summary judgment on plaintiffs' claims for negligence, negligence per se, ultrahazardous activity, and state law declaratory relief as they relate to groundwater contamination because they are time-barred. Plaintiffs do not oppose the motion except with regard to the claim for declaratory relief. Plaintiffs contend that because they have claims for continuing private nuisance and trespass, they may also maintain a claim for declaratory relief. The TRC parties "agree that this motion does not bar Plaintiffs' declaratory relief claim insofar as that claim is derivative of the continuing tort claims." Reply at 6:1-2. Accordingly, the Court GRANTS defendants' motion for summary judgment on plaintiffs' claims for negligence, negligence per se, and ultrahazardous activity.[20]

## VII.    Motions by CCWS, TRC and Generator defendants regarding solid waste (355, 360)

The CCWS[21], GBF/TRC, and Generator defendants move for partial summary judgment on plaintiffs' first, second, third, fourth, fifth, sixth, seventh, ninth, and twelfth claims as they relate to solid

---

[20]  Plaintiffs assert that they may pursue claims for declaratory relief for any "damages incurred within the three years preceding the commencement of the lawsuit, and from commencement of this lawsuit to its conclusion." Opposition at 2:26-3:3. Defendants contend that a plaintiff pursuing continuing nuisance and trespass claim may recover only "for the temporary injury suffered up to three years prior to the commencement of each action," and may not recover for diminution in value or post-filing damages, including prospective damages. *FDIC v. Jackson-Shaw Partners No. 46, Ltd.*, 850 F. Supp. 839, 842 (N.D. Cal. 1994). It is unclear whether plaintiffs disagree with defendants regarding the availability of damages for diminution in value, as defendants only raise this issue in the reply. The Court is inclined to agree with defendants on that point, but need not resolve this question now. The parties do disagree about whether continuing nuisance and trespass damages include post-filing damages. The Court agrees with defendants that recovery in a continuing tort claim is limited "to actual injury suffered prior to commencement of each action. Prospective damages are unavailable." *Baker v. Burbank-Glendale-Pasadena Airport Authority*, 39 Cal.3d 862, 869 (1985); *CAMSI IV v. Hunter Tech. Corp.*, 230 Cal. App. 3d 1525, 1542 (1991).

[21]  The CCWS defendants who have filed this motion are Contra Costa Waste Service, Inc.; Pittsburg Disposal & Debris Box Service, Inc.; Estate of Silvio Garaventa, Sr.; the Garaventa Family Trust; Mary Garaventa, individually and as the administratrix of the Estate of Silvio Garaventa, Sr. and trustee of the Garaventa Family Trust; and Silvio Garaventa, Jr. Although the City of Pittsburg is usually included in the collective name "CCWS," the City of Pittsburg did not join in this motion. The City of Pittsburg denies, however, that it placed any solid waste on plaintiffs' property.

United States District Court
For the Northern District of California

waste.[22]  Defendants contend that plaintiffs do not have any evidence that any of these defendants are responsible for any of the solid waste historically present on and around plaintiffs' property.  Instead, these defendants argue that (1) it is undisputed that Antioch placed solid waste on Parcel 34 in 1957-1958 when it leased that parcel in from Standard Oil for use as a municipal solid waste dump, and (2) it is disputed that the City of Pittsburg disposed of solid waste on Parcel 34 for an undefined period, but no later than 1966.  The moving defendants (who do not include Antioch and the City of Pittsburg) contend that there is no evidence that any of them placed solid waste on plaintiffs' Property.

**A.**     **Generator defendants**

Plaintiffs do not oppose the motion as to the generator defendants, and accordingly the Court GRANTS defendants' motion as to the generator defendants.[23]

**B.**     **CCWS defendants**

As stated *supra*, the Court finds that there are disputes of fact as to whether the surface contamination on plaintiffs' property, including in the "wedge," originated from the Pittsburg landfill. Accordingly, the Court DENIES the CCWS defendants' motion.

**C.**     **GBF/TRC**

Plaintiffs contend that GBF/TRC are liable for their role in causing the December 2001 Markley Creek slope failure, which exposed solid waste on Parcel 34.  Plaintiffs contend that in December 2001, TRC made changes to its stormwater discharge at CCSL, which caused a slope failure at the creek, and that slope failure exposed and discharged into the creek a mixture of soil, landfill, and other buried solid and hazardous waste along the creek to be revealed on plaintiffs' property.

Defendants contend that since there is no allegation that GBF/TRC placed the waste on Parcel

---

[22]  Some of these claims have already been resolved in the Court's August 3, 2009 order, which held that plaintiffs' negligence, negligence per se, inverse condemnation and ultrahazardous activity claims as they relate to solid waste on Parcel 34 were time-barred against CCWS and GBF/TRC.

[23]  The Generator defendants' motion was not filed on behalf of the Prewetts.

34, the only way that plaintiffs can hold them liable is if they can show that GBF and TRC's actions relative to stormwater drainage and municipal waste constitute a continuing nuisance or trespass.  At the August 21, 2009 hearing, plaintiffs' counsel confirmed that the only remaining solid waste/surface contamination at issue is the "wedge" of waste on the southern bank of Markley Creek, and that it is the presence of the "wedge" that is the basis of plaintiffs' claims for continuing trespass and nuisance.  It is undisputed that TRC/GBF did not (1) originate any of the contamination contained in the wedge, and (2) that TRC/GBF was not involved in the design or implementation of the wedge.  Plaintiffs have not shown any conduct by TRC/GBF relative to the wedge, and thus the Court GRANTS summary judgment in favor of TRC and GBF on plaintiffs' continuing nuisance and trespass claims.  *See Hellman*, 6 Cal. App. 4th at 1230; *Shields*, 154 Cal. App. 2d at 255.

## VIII.   Objections

The parties have filed voluminous evidentiary objections.  To the extent the parties object to the expert declarations on various grounds, the Court finds that while particular objections to particular statements may be well-founded, in general the objections go to the weight rather than the admissibility of those declarations.  The parties may renew objections to specific testimony at the time of trial.  With regard to the objections to non-expert declarations and evidence, to the extent the Court has relied on those documents, the specific objections have been addressed *infra*.  The Court finds it unnecessary to rule on the balance of objections because the Court does not rely on that evidence in this order.  Moreover, a number of the objections are not true evidentiary objections, but argument of counsel as to the interpretation of evidence.

**CONCLUSION**

For the reasons stated above, the Court GRANTS in part and DENIES in part the various motions for summary judgment, and DENIES the motion to exclude the testimony of Lynn Spence. (Docket Nos. 348, 351, 353, 355, 357, 359, 378, 381, 386 & 394).

**IT IS SO ORDERED.**

Dated: August 21, 2009

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

36